The People ex rel. Edwin A. Nash, Surrogate, Respondent, *v.* James Faulkner, Jr. Executor, etc., et al., Appellants.

A surrogate who, as such, receives the money of private individuals, is not absolutely responsible therefor; he is only responsible for good faith and reasonable diligence.

Where, therefore, pursuant to an order of the court, surplus money, arising on foreclosure sale of land belonging to an intestate's estate, was paid over to a surrogate, and was by him deposited in good faith with a private banker in good standing and credit, doing a general banking business, pending proceedings to determine the parties entitled thereto, and before the termination of such proceedings the banker failed and his estate proved to be largely insolvent. *Held,* it appearing there was no negligence on the part of the surrogate, that the sureties on his official bond were not liable for the loss.

*Muzzy* v. *Shattuck* (1 Den. 233) distinguished.

*People ex rel. Nash* v. *Faulkner* (38 Hun, 607) reversed.

(Argued October 8, 1887; decided December 6, 1887.

Appeal from judgment of the General Term of the Supreme Court in the fifth judicial department, entered upon an order made the first Tuesday of January, 1886, which affirmed a judgment in favor of plaintiff, entered upon a decision of the court on trial without a jury. (Reported below, 38 Hun, 607.)

This action was brought upon the official bond of a county judge and surrogate.

Samuel D. Faulkner was county judge and surrogate of Livingston county, from the 1st day of January, 1872, until the 9th day of August, 1878, when he died intestate. The

defendants, James Faulkner and Henry J. Faulkner, were sureties upon his official bond which was conditioned that Samuel D. Faulkner should "well and truly, and faithfully in all things, perform his duties as county judge of Livingston county, and shall well and truly and faithfully perform his duties as surrogate of said county of Livingston, and shall well and faithfully apply and pay over all moneys and effects that may come into his hands as such county judge in the execution of his office, and shall well and faithfully apply and pay over all moneys and effects that may come into his hands as such surrogate in the execution of his office without fraud, deceit or delay." While he was surrogate of Livingston county a mortgage executed by Samuel Finley, deceased, was foreclosed, and upon the foreclosure sale there was a surplus of $1,657.46, which was paid to the county treasurer. Afterward in June, 1876, upon the application of the administrators of Finley, an order was made pursuant to the statute directing the treasurer to pay over the money to Faulkner as surrogate, and the money was accordingly so paid to him. At that time James J. Cone was a banker in good standing and credit doing a general banking business at Geneseo, Livingston county, and on the 2d day of June, 1876, Faulkner deposited in Cone's bank the sum $1,212.90 of the money so received from the treasurer, and he took from Cone a certificate of deposit for that sum, payable to his order as surrogate on demand, with interest at five per cent. Immediately prior to the making of that deposit, one of the administrators of Finley informed Faulkner that the personal property of Finley was insufficient for the payment of his debts, and in July, 1876, such administrators filed with the surrogate a petition pursuant to the statute praying for authority to mortgage, lease or sell the remaining real estate left by Finley for the payment of his debts; and thereupon proceedings under the statute were taken and many claims against the estate of Finley were proved and established by different creditors. In December, 1877, Faulkner became sick and unable to perform the duties of surrogate, and he thereupon gave notice to the district

attorney of the county, under chapter 54 of the Laws of 1874, of the fact of such sickness and requested him to act as surrogate, and he did so act. On the 29th day of January, 1877, in the proceedings to mortgage, lease or sell the real estate of Finley, he made an order to sell the same for the payment of debts. The sale was duly made and confirmed and on the 9th day of April, 1877, the administrators deposited the proceeds of the sale, to wit, the sum of $1,591.50 in Cone's Bank to the credit of the acting surrogate, and took from him a certificate of deposit on demand with interest at five per cent, and delivered the certificate to the acting surrogate. On the 16th day of April, 1877, the acting surrogate, upon the application of the administators, made an order that the money received as above stated by the surrogate and by the acting surrogate be distributed among the persons entitled thereto, and caused a notice of such distribution to be published as required by law. Afterward Faulkner recovered from his sickness and resumed the duties of the office of surrogate, and the acting surrogate indorsed and delivered to him as surrogate the last mentioned certificate. On the 1st day of November, 1877, while the proceedings to establish the claims of creditors of Finley were still pending, and while the money represented by the two certificates still remained on deposit Cone, who up to that time had remained a banker in good standing and credit, failed and made an assignment of all his property for the benefit of his creditors, and his estate proved to be largely insolvent. Faulkner died before the settlement of the accounts of the assignee of Cone, and on the 9th day of September, 1878, administration upon his estate was granted to James and Henry J. Faulkner. The two deposits of money were made in Cone's Bank without fraud and in good faith, and without negligence on the part of Faulkner, and with the intention of benefiting the creditors of the estate of Finley. The delay in the distribution of the money among Finley's creditors did not arise from any fault or neglect on the part of the surrogate or the acting surrogate during his illness, but was occasioned by litigation arising over

proofs of claims.    Edwin A. Nash, the relator, was duly elected county judge and surrogate of Livingston county in November, 1878, and has since continued to be and now is surrogate of that county.    Thereafter the administrators of Faulkner turned over to the relator the certificates of deposit, under an agree-ment that the relator should collect from the assignee of Cone the dividends applicable to the payment thereof and distribute the moneys among the creditors of Finley, such action to be without prejudice to the rights of the relator of any credi-tors of the estate of Finley, or of any cause of action which either of them might have against the estate of Faulkner to recover the balance of the moneys, and without prejudice to any defense which the administrators might have.    Thereafter the relator collected and received from the assignees of Cone the dividends applicable to the payment of the certificates, to wit, upon the first certificate the sum of $349.23, and upon the second certificate the sum of $440.30, which were all the moneys in the hands of the assignee applicable to the payment of the certificates.    In December, 1879, the relator demanded of the defendants the amount remaining due upon the two certificates of deposit and they refused to pay the same.    Afterward, at a Special Term of the Supreme Court, upon the *ex parte* application of the relator, an order was made authorizing him to prosecute the defendants in the name of the People of the state of New York as sureties upon the official bond of Samuel D. Faulkner, stating that the same was brought on his relation as surrogate of Livingston county, and this action was brought pursuant to the leave granted by that order.    Upon the trial at Special Term the foregoing facts were established and found by the trial judge, and he ordered judgment against the defendants for the balance unpaid upon the certificates of deposit, amounting to $2,616.14.    Subsequently to the entry of the judgment, and pending the appeal to the General Term, James Faulkner, one of the original defendants, died, and James Faulkner, Jr., his executor, was substituted as a defendant in his place.

*Charles J. Bissell* for appellants. There was, at the time of the commencement of this action, no statute in existence authorizing the Supreme Court to permit the relator to bring this action in the name of the People, and the order authorizing the bringing thereof was a nullity. (Code, § 3347, subd. 11.) At common law a public officer was liable only as bailee, for negligence or malfeasance. (*Browning* v. *Hanford*, 5 Hill, 588; *Moore* v. *Westervelt*, 21 N. Y. 103; Story on Bail., § 620 and notes; *Lane* v. *Cotton*, 1 Lord Raym. 646; *Whitfield* v. *Le Despencer*, Cowp. 754.) In determining the liability of a public officer, the court will examine the statutes prescribing the duties of the officer and will treat the bond, not as a special contract enlarging the responsibility imposed by the statute, but as a guaranty of the performance by the officer of the duties imposed by the common law and the statute. (*United States* v. *Thomas*, 15 Wall. 337.) In the absence of the bond the liability of the surrogate was that of a bailee; upon the bond it is no greater, because the language of the bond cannot be construed as imposing a more stringent liability upon the sureties than the statute imposes upon the surrogate. (*Supervisors Albany Co.* v. *Dorr*, 25 Wend. 440; 7 Hill, 583; *Muzzy* v. *Shattuck*, 1 Denio, 233; *Looney* v. *Hughes*, 26 N. Y. 514, 516; *Fake* v. *Whipple*, 39 Barb. 339; 39 N. Y. 394; *U. S.* v. *Boyden*, 13 Wall. 17, 25; *Peck* v. *James*, 3 Head. [Tenn.] 75; *Ross* v. *Hatch*, 5 Clarke [Iowa], 149; *Cumb. Co.* v. *Powell*, 69 Me. 357; *York Co.* v. *Watson*, 15 So. Car. 1; *Walker* v. *British Guard. Asso'n*, 89 Eng. C. L. 276; *U. S.* v. *Thomas*, 15 Wall. 337; U. S. R. S. [2d ed.], § 1062.) The surrogate is a trustee of the funds of private individuals coming into his hands, and is liable as a trustee and no further. All classes of trustees of the funds of individuals are liable only for negligence or malfeasance. (*Knight* v. *Lord Raymond*, 3 Atk. 480; *Ex parte Belcher*, Amb. 219; *Wicks* v. *Groom*, 3 Drury, 584; *Johnson* v. *Norton*, 11 Hare, 160; 2 Wms. on Ex'rs [5th Am. ed.], 1647; *Churchill* v. *Hobson*, 1 P. Wms. 243; *Rowth* v. *Howell*, 3 Ves. 565; *Adams* v. *Claxton*, 6 id. 226; *Fridge*

482 PEOPLE ex rel. NASH *v.* FAULKNER et al. [Dec.

Statement of case.

v. *Dunn*, 57 Mo. 264; *Fitzsimmons* v. *Fitzsimmons*, 1 S. C. 400; Lewin on Trusts, 299; *Cornwell* v. *Deck*, 8 Hun, 122.) The two transactions represented by the two certificates of deposit, were deposits and not loans. The money could not be collected without a demand. (*Munger* v. *Albany City Nat. B'k*, 85 N. Y. 580; Hill on Trustees, 378, marg. paging, note 1; *Payne* v. *Gardiner*, 29 N. Y. 146; *Upton* v. *N. Y. & E. Bank*, 13 Hun, 269.)

*James Wood* for respondent. The defendants waived the objection raised at the trial, that the action could not be maintained in the name of the plaintiff; and the decision of Judge Dwight on the first trial, that the complaint does not state a cause of action, is untenable. (*Pheonix Bank* v. *Donnell*, 40 N. Y. 410; *Fulton F. Ins. Co.* v. *Baldwin*, 37 id. 648; *Town of Pierrepont* v. *Lovelass*, 4 Hun, 696; *People ex rel. Lord* v. *Crooks*, 53 N. Y. 648.) The action is properly brought in the name of the plaintiff. (31 Hun, 317.) The creditors of Finley's estate cannot maintain an action against these defendants to recover money for which this action is brought. (2 R. S. 106; marg. §§ 36, 38, 40, 42, 43.) In respect to moneys arising from the sale of real estate in the hands of a surrogate at the expiration of his office, the successor in office, who is to order and make distribution, is entitled to the fund in the character of a trustee for the creditors and persons entitled, to distribute or invest in his name of office, as the case may be. (*Supervisor Galway* v. *Stinson*, 4 Hill 137; *Overseer, etc., Pittstown* v. *Overseer, etc., Plattsburgh*, 18 J. R. 418.) The provisions of the Code of Civil Procedure are not at all applicable to this case. This is not an action by a private person on an official bond, but an action by a public officer to enable him to discharge a public trust, and to protect the rights of those whose interests are confided by law to his care and protection, and one which the relator had, if not a positive, yet an implied authority to bring as an incident of his office, and which the proper and faithful discharge of the duties of his office required him to bring. (*Supervisor*

*Galway* v. *Stinson*, 4 Hill, 137; *Overseer, etc., Pittston* v. *Ovevseer, etc., Plattsburgh*, 18 J. R. 418.) The defendants are liable on Surrogate Faulkner's bond, notwithstanding the failure of Cone, in whose banking office the money was deposited. ( *U. S.* v. *Prescott*, 3 How. U. S. 378; *U. S.* v. *Morgan*, 11 id. 154; *U. S.* v. *Dashiel*, 4 Wall. 182; *U. S.* v. *Keiler*, 9 id. 83; *U. S.* v. *Boyden*, 13 id. 17; *Muzzy* v. *Shattuck*, 1 Denio, 233; *Bevans* v. *U. S.*, 13 Wall. 56; *U. S.* v. *Thomas*, 15 id. 337; *Comm.* v. *Cowley*, 3 Penn. 272; *State of Ohio* v. *Harper*, 6 Ohio St. 607; *People* v. *Powell*, 67 Mo. 395. [29 Am. R. 512]; *Halbert* v. *Indiana*, 22 Ind. 122; *Inhabs. Hancock* v. *Hazzard*, 12 Cush. 112; *Ward* v. *School District*, 10 Neb. 293 [15 Am. R. 477]; *Comrs. Jeff. Co.* v. *Luneberger*, 3 Montana, 231 [35 Am. R. 462]; *Lowrey* v. *Polk Co.*, 51 Iowa, 50 [33 Am. R. 114]; 29 Alb. L. J. 404, 405, 406, 407, 408.)

EARL, J.  The finding that James J. Cone was a banker in good standing and credit, and that Samuel D. Faulkner, surrogate, deposited the two sums of money in his bank in good faith and without negligence, required a dismissal of the complaint and a judgment in favor of the defendants.

At common law a public officer is bound to exercise good faith and reasonable skill and diligence in the discharge of his official duties, and he is not responsible for any loss of money which came to his official custody occurring without fault on his part.  But there are various decisions of the federal courts and of some state courts imposing upon public officers charged with the duty of receiving, keeping and disbursing public money responsibility for its loss although accruing without fault or negligence.  ( *U. S.* v. *Prescott*, 3 How. [U. S.] 578; *U. S.* v. *Morgan*, 11 id. 154; *U. S.* v. *Dashiel*, 4 Wall. 182; *U. S.* v. *Keiler*, 9 id. 83; *Boyden* v. *U. S.*, 13 id. 17; *Bevans* v. *U. S.*, 13 id. 56; *U. S.* v. *Thomas*, 15 id. 337; *Commonwealth* v. *Cowley*, 3 Penn. 272; *State* v. *Harper*, 6 Ohio St. 607; *People* v. *Powell*, 67 Mo. 395; *Halbert* v. *State*, 22 Ind. 122; *Inhabitants of Hancock* v. *Hazzard*, 12

Cush. 112; *Ward* v. *School District*, 10 Neb. 293; *Lowery* v. *Polk County*, 51 Ia. 50.)   In these cases it was held that various public officers appointed or elected to receive, disburse and keep public moneys were absolutely responsible for them as debtors although they were stolen or lost or taken away from them by irresistible force and without their fault.   In some of the cases, the liability of the officers was based upon statutes defining their duties and responsibilities, and in other cases upon the terms of their official bonds; and the construction of the statutes and of the bonds was much influenced by views entertained by judges as to the public policy to be enforced in such cases.   In the case of the *United States* v. *Prescott,* Mr Justice McLEAN said that "every depositary of public money should be held to a strict accountability; not only that he should exercise the highest degree of vigilance, but that he should keep safely the moneys which come to his hands.   Any relaxation of this condition would open a door to fraud which might be practiced with impunity.   A depositary would have nothing more to do than to lay his plans and arrange his proofs so as to establish his loss, without laches on his part.   Let such a principal be applied to our postmasters, collectors of the customs, receivers of public moneys, and others who receive more or less of the public funds, and what losses might not be anticipated by the public?"

At the time when that decision was made, in January, 1845, when there were no telegraph lines and but few railroads in the country, public policy may have required from public officers the rigid responsibility thereby imposed.   Most of the custodians and receivers of the public moneys lived at distant points from the central government, where it was difficult to supervise their acts or control their conduct, or check and uncover their frauds.   Yet that rigid rule of responsibility was greatly relaxed by acts of congress, relieving public officers who, without their fault, had lost public moneys entrusted to them; and finally by the congressional act of May 9, 1866 (14 U. S. Stat. at Large, 44), a general act was

passed conferring upon the Court of Claims jurisdiction to hear and determine the claims of any paymaster, quarter-master, commissary of subsistence, or other disbursing officer of the United States, or of his administrators or executors for relief from responsibility on account of losses by capture or otherwise, while in the line of his duty, of government funds. And it was provided that whenever the court should ascertain the fact of any such loss, and that it occurred without the fault or negligence of the officer, it should make a decree setting forth the amount thereof, and the officer should be allowed the same as a credit on settlement of his accounts. Thus as to all the officers named in that act the policy previously declared, and which largely induced the earlier decisions of the courts was changed; and in *United States* v. *Thomas* (*supra*) it was held that a collector or receiver of public money, under a bond to keep it safely and pay it when required, was excused from rendering the same when prevented by the act of God or the public enemy, without any neglect or fault on his part, and that it was a sufficient discharge of his bondsmen from their obligations in reference to such money that the same was forcibly seized by the rebel authorities against the will of the collector, and without his fault or negligence.

Now, in the changed condition of our country, with newspapers, telegraphs and railroads everywhere, in view of this latter decision and the federal statute referred to, it can scarcely be said that, as to federal officers, public policy now requires the enforcement of the rigid rule of responsibility imposed by the earlier decisions. But whatever the rule may now be in the federal courts, and in many of the other states, it is not the settled law of this state that public officers who have given bonds for the faithful discharge of their official duties, become debtors for the public moneys which come into their hands in their official capacity, and are absolutely liable for such moneys although lost without their fault or negligence. In *Supervisors of Albany County* v. *Dorr* (25 Wend. 440), the action was upon the bond of a county treasurer, conditioned that he would faithfully execute the duties of his office and pay over according to law

486       People ex rel. Nash *v.* Faulkner et al.       [Dec.,

Opinion of the Court, per Earl, J.

all moneys which should come to his hands as such treasurer, and render a just and true account thereof to the board of supervisors of his county. The defense was that the money claimed was feloniously stolen from his office without any negligence or fault on his part; and it was unanimously held by the court that the facts stated constituted a defense. And the general rule was laid down that a public officer intrusted with the receipt and disbursement of public funds is not responsible for moneys stolen from his office without negligence or fault on his part, and is liable only for moneys lost through his misfeasance or neglect. The opinion in that case was written by Chief Justice Nelson and concurred in by Justices Bronson and Cowen. The case was carried to the Court of Errors where the judgment was affirmed by an equally divided court. (7 Hill, 583.) The doctrine of that case has been erroneously supposed to have been overruled by the decision in *Muzzy* v. *Shattuck* (1 Denio, 233). In the latter case the action was upon the official bond of a town collector, and the defense was that the money was stolen from him. It was held that the defense was not good, the Supreme Court then being composed of Bronson, Ch. J., and Justices Beardsley and Jewett; and Bronson, who concurred in the prior decision, also concurred in this without any indication that he had changed his views. The prior decision was referred to in the opinion of the court, but not criticised or disapproved. This decision was based, not upon the common law, and not upon the force and effect of the official bond given by the collector, but upon the statutes defining the duties and liabilities of the collector; and the court held that by those statutes he was made an absolute debtor for the money collected by him, and that the fact that the money was stolen, therefore, constituted no defense. That case was afterwards carried to the Court of Errors and unanimously affirmed. The opinions of that court, however, if any were written, have not been reported. It is clear that the decision in *Muzzy* v. *Shattuck* was in no way in conflict with the decision in the case of the *Supervisors* v. *Dorr*, and did not expressly, or by

implication, overrule that decision. The decision in *Muzzy* v. *Shattuck* has always been understood as being based upon the statute which made the collector an absolute debtor for the moneys which he was ordered by his warrant to collect. (*Looney* v. *Hughes*, 30 Barb. 605; affirmed, 26 N. Y. 514; *Fake* v. *Whipple*, 39 Barb. 339; affirmed, 39 N. Y. 394.) While the case of *Supervisors* v. *Dorr* was affirmed by an equal division of the Court of Errors, that affirmance does not add to it as an authority, and it remains simply the unanimous decision of the Supreme Court. In view of the decisions of the federal and state courts above cited, and the fact that that decision has been much questioned and has by some been supposed to have been overruled by the decision in *Muzzy* v. *Shattuck*, it should, probably, not be regarded as binding authority in this state, and the question therein decided may yet be regarded as an open one. When a case arises against an officer for not paying over and accounting for public moneys intrusted to him in his official capacity, it will be necessary to determine whether his liability in the absence of statutes specially defining it, shall be governed by the common law, or whether the broad and more rigid rule of responsibility laid down in the cases above referred to shall be enforced in this state. It is not necessary to decide that question in this case because the money here received by the surrogate was not public money, but the money of a private estate or of private individuals. It does not follow because public policy requires that public officers who receive public money should be held to the rigid responsibility, that the same rule should be applied to public officers who receive the money of individuals who are stimulated by private interests to some watchfulness over the conduct of the officials and to some scrutiny as to the custody of their funds.

The surrogate was not a public officer appointed to receive or disburse public money, and it was not even his main duty to receive, keep or disburse the money of individuals. His principal duties were judicial in their nature, and any duties which he had in reference to moneys which came into his hands

were merely incidental to his judicial duties. The statute required that the surplus money arising from the foreclosure sale should be paid over to the surrogate, and he was to hold the same for distribution among the creditors of the deceased, upon proof by them of their claim as provided by the statute. (2 R. S. [6th ed.], 118.) The proceeds of the sale of the real estate made by the administrators of Finley were required to be brought into the office of the surrogate, to be retained by him for distribution among the creditors in accordance with the provisions of the statute. (3 R. S. [6th ed.],115.) This money, therefore, came lawfully into the possession of the surrogate, and there is nothing in the statute which makes him an absolute debtor for it. He was to keep it, and when the time came for its distribution was to distribute it among the creditors of the deceased. It might remain in his custody for a long time, until the claims of the creditors had been established, and all litigation in reference to them and the money finally ended. The law did not provide the surrogate with a safe or other place of deposit, but left it to his own good sense and judgment to determine how he should keep and safely care for the money. There is nothing in the policy of the law which requires that he should be absolutely responsible for such money. If this money had been paid under an order of any court to its clerk or to a receiver or any other officer, there would not have been the absolute responsiblity which is claimed by the plaintiff in this case. Such clerk or other officer would have been responsible only for good faith and reasonable diligence in the care of the money. (Story on Bailments, § 620.) Why should a greater responsibility rest upon the surrogate than upon such clerk or officer? There is no clerk or officer of the surrogate's court to whom the money can be paid, and hence the surrogate is required to receive and distribute it himself. He is merely the trustee or agent of the private parties interested in the money, and no greater or higher responsibility should be imposed upon him than would be imposed upon any agent or trustee. If he had been a trustee and had deposited this money in good faith, without

any negligence on his part in this bank, its loss by the failure of the banker would have been a good defense. (1 Perry on Trusts [3d ed.], § 443.) Why should his responsibility be greater than that of the administrators from whom he received the money? The statutes and the official bonds of executors and administrators impose upon them as broad an obligation as is imposed upon the surrogate by the statutes and by his official bond, and yet it is conceded that if the administrators had deposited the money of their estate in this bank, in good faith, and without negligence they would not have been responsible for its loss. (2 Williams on Executors [5th Am. ed.], 164; 3 Redfield on Wills, 394.)

There is nothing in the phraseology of the bond given by the surrogate which englarges his statutory liability. It is a bond simply for the faithful performance of his duties, and the faithful application and payment of all moneys that may come into his hands. It imposed upon the surrogate no broader responsibility or liability than the statute. It was simply designed to enforce and secure the faithful discharge of his duties, and any defense which he would have had when called to account for the money which came to his hands is available to his sureties when sued upon the bond.

We have, therefore, reached the conclusion that in this state there is no statute applicable to surrogates which imposes upon them the broad liability claimed by the plaintiff; that there is no public policy which requires that the rule of responsibility should be thus rigorous, and that there is nothing in the terms or letter of the bond which imposes the absolute liability claimed.

This deposit in Cone's Bank was not a loan to him, an unauthorized investment which would be condemned by the law. It was the same as a deposit in an incorporated banking institution. It was probably not as safe or judicious, but that circumstance only had legal bearing upon the question of good faith and proper care and diligence, and that has been found in favor of the defendants. The fact that the deposit was payable with interest makes no difference as it was still a

deposit payable upon demand, and the requirement of interest was a provident arrangement for the benefit of the persons interested in the fund.

We are, therefore, of opinion that the facts proved and found in regard to the deposit and loss of this money established a defense available to these defendants, and without considering other questions brought to our attention and ably argued, we conclude that the judgment should be reversed and a new trial granted, costs to abide event.

All concur.

Judgment reversed.