\* STATE, FOR USE, ETC., *v.* COPELAND.

(*Nashville.*    March 2, 1896.)

1. PUBLIC OFFICERS.    *Not insurers of funds in their hands.*

A public officer is not an insurer of the safety of public funds in his hands, under a bond conditioned faithfully to perform his duties and to collect and pay over moneys, but responsible only for the exercise of good faith, diligence, prudence. caution, and a disinterested effort to keep and preserve the fund for those entitled.    (*Post, pp. 297–318.*)

Code construed: ¿ 712 (M. & V.); ¿ 599 (T. & S.).

Cases cited and approved: Governor *v.* McEwen, 5 Hum., 241; Peck *v.* James, 3 Head, 76; Willeford *v.* Watson, 12 Heis., 476; Deitz *v.* Mitchell, 12 Heis., 676; 15 Wall., 342; 31 Am. Rep., 284; 34 Pac. Rep., 944; 78 Ala., 576; 74 Me., 262; 66 Me., 357; 40 Am. Rep., 675; 107 N. Y., 477.

Cited and distinguished: Hill *v.* Alston, 12 Heis., 569; Comfort *v.* Patterson, 2 Lea, 670.

2. SAME.    *May deposit public funds in bank.*

A deposit of public funds in a bank of undoubted standing and reputation is not negligence or want of proper business prudence and caution on the part of a public officer whose duty it is to preserve them.    (*Post, pp. 322–326.*)

Cases cited and approved: Deitz *v.* Mitchell, 12 Heis., 676; Willeford *v.* Watson, 12 Heis., 476.

3. SAME.    *Not debtor or special bailee, but trustee of public funds.*

A public officer is not to be considered as a debtor for public funds in his hands which he has no right to use in any way except for the purposes of his trust, and he holds them not strictly as a special bailee, but as a trustee clothed with legal duties and liabilities.    (*Post, pp. 322–326.*)

4. SAME.    *Liability of County Trustee for school funds.*

The liability of a County Trustee who gives a bond faithfully to

---

\* The conflicting authorities on the liability of the sureties on an official bond for the loss of money by theft or bank failure are reviewed in a note to *Wilson* v. *People* (Colo.), 22 L. R. A., 449.

State, for use, etc., *v.* Copeland.

perform the duties of his office and collect and pay over school funds, is fixed not merely by the terms of his bond, but by the laws relating to his office. (*Post, pp. 300–302, 326.*)

### FROM OVERTON.

Appeal from Chancery Court of Overton County. T. J. FISHER, Ch.

G. B. MURRAY for Overton County.

VERTREES & VERTREES, J. A. BARNES, W. W. GOODPASTURE, and W. H. HUSSEY for Copeland.

WILKES, J.  This is a bill against the defendant, Hardy Copeland, and others, as sureties upon his official bond as County Trustee of Overton County, for school taxes deposited by him in the Nashville Savings Company, at Nashville, Tenn., called in the record and generally known as Marr's Bank. Upon the hearing, the Chancellor gave judgment against the defendants for $3,119, and interest from October 12, 1895, and all costs, and the defendants have appealed and assigned errors.

These assignments are as follows: (1) In finding that Mr. Copeland was not sufficiently careful and diligent; (2) in holding that Mr. Copeland should have acted only upon an *examination* of the bank, made, or caused to be made, or upon *knowledge;* (3) in holding

that Mr. Copeland, as Trustee, was bound, in law, to account for and pay over this fund, unless it was lost by the act of God or the public enemy; (4) in rendering a decree against Mr. Copeland and his sureties for the full penalty of the bond, to be discharged upon the payment of $3,119 and interest; (5) in rendering a decree against the defendants for said $3,119, interest, and cost; (6) in not rendering a decree dismissing the bill.

Only two real questions are presented, the first of which is, whether Copeland was an insurer of the safety of the funds in his hands, and the other, whether, if not an insurer, he exercised that degree of care that he should have done for the safe keeping of the funds in his hands. We consider the first proposition primarily, for if it be held that the Trustee is liable for such funds in every event and under all contingencies, except when the loss arises from the act of God or the public enemy, then the latter question is immaterial, and need not be considered.

The learned Chancellor in the Court below delivered a written opinion, from which the reasons and grounds of his decision may be gathered. He says: "I am fully satisfied that Copeland did not intend or expect to lose the money when he placed it in Marr's Bank, and he believed it was safe there until a very short time before the bank failed, and perhaps up to the day of its closing." The Chancellor then adds: "In the view I take of the

State. for use, etc., *v.* Copeland.

case, conceding that Copeland acted in good faith, believing that this bank was entirely safe, the question is, Can a Trustee make such a defense avail him in case the money is lost by the failure of the bank?" And the Chancellor finally says: "I am constrained to hold that the defendant, Copeland, and his sureties, are responsible for the money under the facts of this case, both upon the ground that the defense set up in the answer—that the bank had a good reputation, was an old bank of high standing, that the deposit was made in good faith and confidence, and lost by the failure of the bank, and without negligence on the part of Mr. Copeland— was not good in law, and also that the facts do not establish that high degree of diligence that would excuse defendants from accounting for the money, even under the rule requiring a faithful discharge of duty. . . . This is not a question of intent. It is a question of diligence or negligence in a legal sense."

The question of the measure of liability of a public officer for funds in his hands, is one of prime importance, and, at the same time, one upon which there is some diversity of opinion. In some cases the liability of the officer is made to turn upon the terms of his bond, and it is construed as having been enlarged and made an absolute engagement to pay over the money in any event and under every contingency. In other cases the officer is regarded as a debtor for the funds that go into his hands,

and not a bailee or trustee of such funds. In other cases the officer is held liable on broad grounds of public policy, and the obligations resting upon him are made absolute and unconditional, because a different construction would open up a door for fraudulent practices and evasions by public officials. The matter is forcibly presented in the notes to *State* v. *Harper*, reported in 67 Am. Dec., 363 to 373; and also in the case of *Wilson* v. *The People*, reported in 22 L. R. A., p. 451 and notes, where the several grounds of liability are referred to, and the cases cited under each.

Considering these grounds of liability in the order named, it is evident that the terms of the bond must have some weight in determining what the liability of the officer is. But the main object of the bond, under our law, is not to fix the limit of the officer's liability, but to superadd the security of the bondsmen to that of the principal. The liability of the bondsmen is outlined in the bond, but, after all, the extent of liability of both principal and securities, and the obligations they are under, are fixed and limited by the statutes and laws relating to such officers.

The bond required of the County Trustee, to cover school funds, is a special one. M. & V. Code, § 712.

The bond executed by defendant is in these words: "Now, therefore, should the above bounden Hardy Copeland truly and faithfully perform the duties of

the office of County Trustee for the term of his office, and shall faithfully collect and pay over, within the time and in the manner prescribed by law, to the proper officer designated by the laws of Tennessee to receive the same, all school taxes by him collected, or that ought to be collected during his said term of office, then this obligation to be void; otherwise, to remain in full force and effect."

The oath required of the officer is to the same effect as the bond. M. & V. Code, § 716.

The Trustee is required to keep the school funds separate from all others. M. & V. Code, § 1167. And to use it directly or indirectly, or to receive, or agree to receive, any fee or interest from any bank for the deposit or use of the money, is made a felony. Acts of Ex. Ses., 1885, Ch. 16.

The bond does not, in terms, fix the extent of the officer's liability. That is regulated by law, and we are of opinion that there is nothing in the terms of the bond or the requirements of the statutes, that makes the officer liable, as on contract, to keep, at all hazards, and under every contingency, and to pay over funds in his hands, but he is only obligated to pay according to law. Can he, under our law, be held as a debtor for the fund, and, hence, liable for it in any event? If so, he is impliedly given the right to use the funds, to receive and retain interest upon them, and to use them as his own. In the cases holding this doctrine, it is laid down that if the officer make a profit or interest

by using the funds, he is not liable therefor, but the usufruct belongs to him. This is certainly not the theory of our law, which makes it a felony for the officer to use it directly or indirectly, or to receive, or agree to receive, any interest from any bank for the use or deposit of it; and not only is it contrary to the statute, but in our view it is unwise policy to consider the officer as a debtor. He is a trustee, charged by statute with certain duties and responsibilities, but having no right to use the funds for his own purpose or to make them his own.

The third class of cases so construes the bonds, and so fixes the duties of public officers holding public funds, as to make them insurers of the safety and forthcoming of the fund, upon broad grounds of public policy. The leading case holding this doctrine of strict accountability is that of *United States* v. *Prescott*, 3 How., 589. In that case the bond was conditioned to keep safely and pay over when required to do so, and the Court held the officer liable, although the funds were stolen without fault on the part of the officer. This was followed in *United States* v. *Dashiell*, 4 Wall., 182, where the condition of the bond was to pay over and account; and in *Boyden* v. *The United States*, 13 Wall., 17, where the condition of the bond was to discharge all the duties, and, under the Act of Congress, it was the duty of the officer to pay over. This was followed by the case of *United States* v. *Morgan*,

11 How., 154; and *Bevans* v. *The United States*, 13 Wall., 56; *United States* v. *Keehler*, 9 Wall., 83; *United States* v. *Watts*, 1 N. M., 553; *State* v. *Nevin*, 3 Am. St. Rep., 873.

The rule has been followed in many cases in the State Courts, and evidently on the authority of the leading case. We cite only a few, by way of illustration. In *State* v. *Moore*, 74 Mo., 413 (41 Am. Rep., 322), the bond was "to perform all the duties," and the statute made it a duty to "deliver to his successor all money," and the officer was held liable for depositing money, as treasurer, in a bank of high standing that subsequently failed. In *Omro Suprs.* v. *Kaime*, 39 Wis., 468, the bond was "to faithfully discharge the duties," and "properly and legally disburse and pay all moneys," and the officer was held liable for a deposit in a bank of good reputation, but which afterward failed. In *State* v. *Chaft*, 24 Ark., 550, the condition was "safely to keep the money," and it was lost by failure of a bank reputed to be good, and the officer was held liable. See other cases cited in 22 L. R. A., 451; in the notes to the case of *Wilson* v. *People*, Col., reported in 34 Pac. Rep., 944; *State* v. *Harper*, 67 Am. Dec., 363, and notes; 2 Am. & Eng. Enc. L. 466l, 466m, notes 1 and 2.

It is evident that the Chancellor followed the rule laid down in the Prescott case, and cases in harmony with it, and held defendants liable on grounds of public policy. He says: "Ruin will

occasionally fall upon an innocent man, but better this than to open a door for the escape of a dishonest custodian of the means, wrung from the honest taxpayer, for the support of the government and the education of the children.''

On the other hand, and holding a modified or contrary doctrine, may be cited the case of *United States* v. *Thomas*, 15 Wall., 327, decided in 1872, in which the case of *United States* v. *Prescott*, 3 How., 589, was limited, and it was held that an officer would be excused by the act of God or the public enemy. It is there said: ''The general rule of official obligation, as imposed by law, is that the officer shall perform the duties of his office honestly, faithfully, and to the best of his ability. This is the substance of all official oaths. In ordinary cases, to expect more than this would deter upright and responsible men from taking office. This is substantially the rule by which the common law measures the responsibility of those whose official duties require them to have custody of property, public or private. If in any case a more stringent obligation is desirable, it must be prescribed by statute, or exacted by express stipulation.'' And again: ''Where, however, a statute merely prescribes the duties of an officer—as, that he shall safely keep money or property received or collected, and shall pay it over when called upon to do so by the proper authority—it cannot, without more,

be regarded as enlarging or in any way affecting the degree of his responsibility."

By an Act passed in 1866, the Congress of the United States provided "that officers who lose public funds without fault or negligence, may present the matter to the Court of Claims, and if that Court find the fact to be that way, it shall be so certified, and the officer shall be given credit by the treasurer in his accounts." Since then, it has also been provided that certain classes of officers, like revenue collectors and clerks, shall deposit the funds in banks—designated depositories of the United States. Consequently, it appears that when the Act of 1866 and the decision in Thomas' case are considered, the rule of liability with respect to United States officers, is that they are not liable for public funds lost without fault or negligence on their part. It is evident that the rule laid down in the Prescott case was considered too harsh and exacting, and Congress, by the Act of 1866, prescribed a different degree of liability.

There are other cases, however, which have not followed the Prescott case, among which may be cited *York Co.* v. *Watson*, 15 S. C., 1 (40 Am. Rep., 675). In this case it appeared that the County Treasurer had deposited the public money in his hands in a savings bank. The bank failed, and the money was lost. The bank had a good reputation, and the money was deposited to his credit, as Treasurer. The Court held that he was not liable. The

20—12 P

Court stated the rule of liability as to trustees, receivers, administrators, guardians, and the like, and then asks: " If it would be wrong in principle to hold a private trustee responsible for loss which no care of his could have prevented, would it not be equally wrong to hold a public officer responsible under like circumstances? " The question is answered in the affirmative by the opinion.

*Cumberland* v. *Pennell,* 66 Me., 357 (31 Am. Rep., 284). In this case the County Treasurer had money in his safe in his office. Robbers came in and beat him up, and then robbed the safe. The Court below ruled that it was no defense, but, on appeal, the Supreme Court held that it was a good defense, and that he was not liable. The case is well reasoned, and announces the rule of the common law.

In reviewing the cases which follow Prescott's case, Virgin, J., says: " Notwithstanding the high character of the Federal Courts, whose decisions are now cited, we cannot yield our convictions as to the construction to be given to the bond in such case, or concur in relation to the new-born public policy, based upon supposed facility for temptation, which depositaries of the public money are said to possess, for collusive robberies." "For," as said by Redfield, J., in *Bridges* v. *Perry,* 14 Vt., 262, "we cannot believe that they are founded on any just warrant, either of sound judgment or constant experience." This case was approved in the later case of *Stroud* v. *Pennell,* 74 Me., 262.

In Alabama it is held that a tax collector who, without fault, is robbed by irresistible force, is not liable for the money of which he is robbed. *State* v. *Houston*, 78 Ala., 576.

The Court of Appeals of New York considered the question in *People* v. *Faulkner*, 107 N. Y., 477. In that case it appeared that the Surrogate deposited moneys in his hands, which were the proceeds of judicial sales, in a private bank which failed. He received interest on the fund, for the benefit of the litigants, but it was deposited subject to check or demand. The Court recognizes the distinction between public funds and private moneys of litigants, and it also reviews the Federal cases in the light of the Act of Congress of 1866 and the case of *United States* v. *Thomas*. The common law rule of liability was declared to be the true one, and care and good faith to be the measure of liability. As the banker, in that case, was a man of good standing, and there was no negligence, the Surrogate was held to be not liable. This case also recognizes the present condition of things—that it is the part of prudence to keep funds in bank, as the best and safest place.

*Colorado* v. *Wilson*, 34 Pac. Rep., 944. In this case, a Clerk of a Court deposited the money, in his hands as Clerk, in a bank of good standing. The bank broke and the fund was lost. It was held that the Clerk was not liable. Among other things, the Court, through Goddard, J., said: "From the agreed

facts, it appears that the money was lost through no
fault of the Clerk.  He deposited the money in a bank
of reputed solvency, as Clerk of the Court, and, in
doing so, acted as prudent men ordinarily do with
their own funds.   The judgment of the Court below
must, therefore, be upheld, if at all, upon the ground
that the condition of his official bond imposed upon
him an absolute obligation to pay the money when
required, and that no exercise of diligence on his
part will exonerate him from such obligation.   Such
is the contention of counsel for appellee, and, for
its support, he relies on the case of *United States*
v. *Prescott*, 3 How., 578, decided by the Supreme
Court of the United States in 1844, as the leading
case, and several other cases in that Court, as well
as some decisions by State Courts which approve
and follow the doctrine therein announced.   In these
cases, in which the rule contended for was sustained,
the Court had under consideration the liability im-
posed by the official bond of receivers of public
money, and the conclusions arrived at were influenced
largely by considerations of public policy.   Whether
the case at bar is sufficiently analogous to these
cases to bring it within the rule therein announced,
it is unnecessary to decide, since the Supreme Court
of the United States, in a later case, has very much
modified, if it has not, in effect, overruled, the ex-
treme doctrine laid down in its earlier decisions.   In
the case of *United States* v. *Thomas*, 15 Wall.,
337, Justice Bradley, in speaking of the leading

State, for use, etc., v. Copeland.

case of *United States* v. *Prescott, supra,* said: 'After reciting the condition of the bond, the Court adds, with a greater degree of generality, we think, than the case before it requires: "The obligation to keep safely the public money is absolute, without any condition, express or implied, and nothing but the payment of it, when required, can discharge the bond." This broad language would seem to indicate an opinion that the bond made the receiver and his sureties liable at all events. . . . And as the money in the hands of a receiver is not his—as he is only custodian of it—it would seem to be going very far to say that his engagement to have it forthcoming was so absolute as to be qualified by no condition whatever, not even a condition implied in law.' And, after reviewing the principal cases relied on by appellee, he further said: 'So much stress has, in almost every case, been laid upon the bond as forming, either directly or indirectly, the basis of a new rule of responsibility, that it seems especially important to ascertain what are the legal obligations that spring from such an instrument. The learned judges, in the great generality of the remarks made in some of the cases referred to, with regard to the liability of a receiving officer, and especially of his sureties, by virtue of his bond, have evidently overlooked what we conceive to be a very important and vital distinction between an absolute agreement to do a thing and a condition to do the same thing, inserted in a bond. In the

latter case the obligor, in order to avoid the for-
feiture of his obligation, is not bound at all events
to perform the condition, but is excused from its
performance when prevented by the law or by an
overruling necessity. And this distinction, we think,
affords a solution to the question involved in this
case. . . . The condition of an official bond is
collateral to the obligation or penalty; it is ·not
based on a prior debt, nor is it evidence of a debt,
and the duty secured thereby does not become a
debt until default is made on the part of the prin-
cipal. Until then, as we have seen, he is a bailee,
though a bailee resting under special obligations.
The condition of his bond is, not to pay a debt,
but to perform a duty about and respecting certain
specific property, which is not his, and which he
cannot use for his own purposes.'

" While the majority opinion distinguished the case
under consideration from those preceding it, we think
the reasoning of the learned justice who wrote the
opinion, logically and necessarily overrules the doc-
trine laid down in the former cases. If, as therein
announced, the obligation imposed by the bond is
absolute, and the officer was an insurer of the money
received by him, how could the manner or cause of
its loss affect his liability? Wherein is he more at
fault when overpowered by one or two robbers than
he is when intimidated by an army?

"Justice Miller refused to concur in the majority
opinion because it did not frankly overrule those

cases, and abandon the doctrine on which they rested, and, in his dissenting opinion, stated his personal views upon the question, as follows: ' " When the case of the *United States* v. *Dashiell*, 4 Wall., 182, came before the Court, I was not satisfied with the doctrine of the former cases. I do not believe now that, on sound principle, the bond should be construed to extend the obligation of the depositary beyond what the law imposes upon him, though it may contain words of express promise to pay over the money. I think the true construction of such a promise is, to pay when the law would require it of the receiver if no bond had been given, the object of taking the bond being to obtain sureties for the performance of that obligation. Nor do I believe that, prior to these decisions, there was any principle of public policy recognized by the Courts, or imposed by the law, which made a depositary of the public money liable for it when it had been lost or destroyed without any fault or negligence or fraud on his part, and when he had faithfully discharged his duty in regard to its custody and safe-keeping. .

" We believe the true rule is that a public officer who receives money by virtue of his office, is a bailee, and that the extent of his obligation is that imposed by law; that, when unaffected by constitutional or legislative provisions, his duty and liability are measured by the law of bailment. If a more stringent obligation is desired, it must be prescribed

by statute; that his official bond does not extend to such obligations, but its office is to secure the faithful and prompt performace of his legal duties. Instances where the constitution and statutes of the State have increased the common law liability of certain officers, were recognized by this Court in two cases at least. In the case of *State* v. *Walsen*, 17 Col., 170 (28 Pac. Rep., 1119), it was held that, by the constitutional provisions, the State Treasurer was made absolutely liable for State moneys received by him; and in the case of *McClure* v. *Commissioners*, 34 Pac. Rep., 763 (recently decided), it was held that a County Treasurer, by virtue of the statute regulating the duties of his office, was a bailee with express and extraordinary liability. No constitutional or statutory provision in this State imposes a more stringent obligation upon a Clerk of the District Court than that imposed by the common law. This rule of common law, as laid down by Justice Story, is as follows: 'In respect to property in the custody of the officers of a Court, pending process and proceedings, such officers are undoubtedly responsible for good faith and reasonable diligence. If the property is lost or injured by any negligent or dishonest execution of the trust, they are liable in damages. . . . The degree of diligence which officers of the Court are bound to exert in the custody of the property, seems to be such ordinary diligence as belongs to a prudent and honest discharge of their duties, and such as is required

of all persons who receive compensation for their services.' Story, Bail., Sec. 620.

"It is insisted in argument that this doctrine refers only to specific property, and does not apply to money deposited with the clerk, because it is assumed that he holds the relation of debtor to the fund, and, therefore, may use it as his own. To this we cannot agree. The money received by him is a trust-fund, and a conversion of it to his own use would constitute embezzlement, and subject him to criminal prosecution. The defendant, Wilson, as appears from the agreed facts, did not mix the money in question with his own funds, or in any manner treat it as his own. He deposited it in the bank, as Clerk, and the bank had notice, thereby, that the money so deposited was held by him in his official capacity. At the time of the deposit, the bank was in good standing. We think, under the circumstances, he is not chargeable with any fault that should render him or his sureties liable for the loss. The judgment of the Court below will be reversed, with directions to enter judgment for defendants."

This principle has been recognized and announced in Tennessee. In *Governor* v. *McEwen*, 5 Hum., 241 (1842), it was declared that the liability of public officers is to be determined like that of private trustees, or, as Reese, J., expressed it, "The measure of fiduciary responsibility, in the view of a Court of Chancery, will be the same, whether arising from

public or private relations." In *Peck* v. *James*, 3 Head, 76 (1859), the rule was reaffirmed. James, the Trustee of Grainger County, moved against Peck, his predecessor in office, for a balance of school funds in his hands. Thereupon, Peck filed a bill to be exonerated, on the ground that the money had been paid to him in bills of the Bank of East Tennessee, but that the bank broke before he was required to pay out all the fund, and while a balance of $680 in these notes remained in his hands. It was held that the Trustee was entitled to be exonerated. "We think," said Caruthers, J., "the principle settled in the case of the *Governor* v. *McEwen*, 5 Hum., 241, must govern this." It is held in that case that "the measure of fiduciary responsibility, in the view of a Court of Chancery, will be the same, whether arising from public or private relations," and that, in the absence of bad faith, the same fair and equitable principles of adjustment which govern the subject of agency in general will be applied to and regulate the accountability of public agents.

There are other cases where the officer and his sureties were held liable, but upon other grounds, which do not exist in this case.

In *Hill* v. *Alston*, *C. & M.*, 12 Heis., 569, the Clerk and Master of Shelby County was held liable for money lost by the failure of the bank in which it was deposited It appeared that the money was deposited in his individual, and not in his official, name. The money so deposited was partly

money he had received officially and partly his own private means. Interest was paid to him on these deposits. He was held liable on the ground that the money was deposited with his personal money to his individual credit, under an agreement to receive interest thereon. The inference is undeniable that if the facts had been otherwise, the Clerk would not have been held liable.

In *Comfort* v. *Patterson*, 2 Lea, 670, the question was whether a Clerk and Master could set off a claim on account of a deposit made in a broken bank, against a note the bank held against him. The facts were that the deposit was to the credit of "M. L. Patterson, C. and M." It really consisted of (1) his individual means, (2) and costs to which he was entitled, (3) and funds received officially. A few days before the bank failed, he deposited $1,500 of his individual means to the credit of this account. The note against which he pleaded the set-off was only for $1,000. It was held that this plea of set-off was good. It was held that the Clerk's "individual" share of the fund exceeded his indebtedness, and could be set-off against it. The question was reserved whether he could set off the balance of the fund against an individual claim. It was said by way of *dictum*, that funds of various cases deposited in one general deposit, in the officer's name as Clerk and Master, "without any designation of the case or party entitled," would be

personal, and the words would be *descriptio personœ,* "not altering the rights of either party."

We think that it is not in accord with the spirit of our decisions, whatever it may be elsewhere, nor with sound public policy, to hold a public officer liable for public funds as an insurer. His obligation is the same as that prescribed by the common law, which is that he discharge his trust with diligence, prudence, caution, and good faith, such as prudent persons bestow upon their own important affairs. This is the rule laid down in Mechem on Pub. Officers, Sec. 301; Murfree on Official Bonds, Sec. 197; *United States* v. *Thomas,* 15 Wall., 342; *Cumberland* v. *Pennell,* 31, Am. Rep., 284.

Under such rule, a private trustee is not liable for money lost by the failure of a bank, when the reputation of the bank is good, and the money is deposited in good faith, to the trustee's credit, separate and apart from his own. 1 Perry on Trusts, 443; *Deitz* v. *Mitchell,* 12 Heis., 676. And the same rule applies to an administrator ( *Willeford* v. *Watson,* 12 Heis., 476) or an executor (Pritchard on Wills, 699).

It is difficult to see what just end or sound public policy can be subserved by adopting a different rule as to public officials. If a public officer is held to be an insurer against loss when he exercises the utmost diligence, caution, and good faith, it will result that no man of any financial standing or business prudence would accept a public trust

which involves the handling of public money. There would be but little inducement to act honestly and in good faith, since neither would avail against an unforeseen and unavoidable casualty.

We are of opinion that, under our statutes and decisions, a public officer intrusted with public funds is not an insurer against loss, but is ·liable only if he acts without proper diligence, caution, prudence, and good faith. We think this is the sound rule, notwithstanding the weight of earlier authority holding the contrary doctrine, and all, or nearly all, based upon the Prescott case. We proceed, therefore, to examine whether Copeland, the Trustee, did exercise the proper diligence, caution, prudence, and good faith necessary to absolve him from liability for the loss in this case. He had in his hands $5,000 of public money, which he deposited in Marr's Bank on the ninth of February, 1893. He could not, at the time, lawfully pay it out, and it was his duty to keep it. Before making the deposit in that bank, he consulted the Judge of the County Court of Overton County, and requested him to have the Court designate a place to put the fund until he was called upon to pay it out, stating that he would put it anywhere the Court would select. He advised with Mr. Windle, one of his bondsmen and a good business man and merchant, as to where it should be placed, and Windle suggested that the local bank of Livingston, in Overton County, could be easily robbed, and advised that it be kept in some Nashville bank.

The Trustees of the county for several years had, as a matter of safety, deposited the public funds under their control in Nashville and Sparta. He conferred with many persons, who advised that it be placed in some good bank. Marr's Bank stood high at the time. Defendant's bondsman, Windle, recommended it. He was advised by Judge Goodpasture, a former resident of Overton County, a man of experience and substance, to select Marr's Bank, with the statement that he had been depositing in it for twenty-six years. He was then residing at Nashville and depositing in it. It appears to have been the only bank in Nashville that did not close its doors in the panic of 1873. The reputation of the bank at Nashville, as well as elsewhere, was excellent. It had been in apparently successful operation for thirty years. Other bankers, lawyers, and business men of Nashville say that its reputation was above suspicion. The money was put to his credit as Trustee, and was not mixed with any funds of his own. It remained until June 13, 1893, when Copeland attempted to draw it out. After persistent demands, $2,000 was paid, and then the remaining $3,000 was again persistently demanded. The whole of it was all the time subject to check on demand. The bank could not pay the $3,000, and suspended and assigned on the next day, and proved to be totally insolvent, and only a pro rata of about six per cent., or $180, has ever been received since its suspension.

It is said, however, that the deposit was made with an understanding that Copeland was to receive six per cent. interest on it, and interest was subsequently entered up on the account on the books of the bank, the amount being $42.50, as of date March 31, 1893. Copeland denies positively that he ever received a cent of interest, directly or indirectly, or that there was any agreement that he should receive any. It appears to have been the custom of the bank to enter upon the pass book of the customer the fact that interest was to be allowed when such was the agreement, and no such entry was made upon the pass book given to Mr. Copeland. There was, however, an entry made on the ledger of the bank, after the name of Copeland, Trustee, " 6 per cent." This is explained by Mr. Freeman, the bookkeeper, with the statement that the "country accounts" of the bank were, as a rule, interest bearing, and he so entered it without any instructions to do so. Marr gives the same explanation. All the witnesses, Marr, Freeman, Copeland, and Goodpasture, state that no interest was to be paid, Marr's statement being somewhat indefinite and negative in character.

It appears that, previous to this, Copeland had some funds in the local bank of Livingston, which offered to pay interest on the deposit, which Copeland refused, but he did accept a gratuity—as he says, a present—in consideration of his deposit, and a credit of two per cent. was entered on his account on

several occasions. The statement of the president and cashier of the bank at Livingston are given, and from these we get the only intimation of fact which tends to show any want of good faith and unselfish action on the part of Copeland, outside of the book entry to which we have already referred. It appears that the defendant, Copeland, had $1,700 on deposit in this bank, and drew it out only a day or two before making the deposit in Marr's Bank. He had kept his money in this bank for a year or two, and had been paid interest, or a gratuity, as before stated. It is argued from this, and the entry upon the ledger at Marr's Bank, that Copeland was to have interest from the latter bank at the higher rate of six per cent. instead of two, as paid by the Livingston bank. Mr. Estes, the cashier of the Livingston bank, states that, a short time before the failure of Marr's Bank, he met with Copeland in Nashville. At that time there was a financial panic all over the country, which had affected the country banks as well as the city banks of Nashville. The Capital City Bank of Nashville closed, and on the next morning witness had a conversation with Copeland, in which the distressed condition of all the banks was commented upon, and in that conversation Copeland stated that he had his money in Nashville and was a little uneasy about it. Witness said to him if he would take his deposit back to the Livingston bank, he could check on it at any time, and he and Miller, the president, would go security

for the bank and allow four per cent. interest on the deposit.    Copeland replied: " Can't you beat that? " and witness responded that he could not, and would not, and Copeland thereupon replied: "I can beat that here in Nashville." He then adds, but in a very indefinite way, that he intimated to Copeland that Marr's Bank was unsound, and Copeland then referred to the Fourth National of Nashville, and left witness under the impression it was in the Fourth. A few days thereafter Copeland was in Livingston, and stated to witness that he had seen Miller, the president, and he had agreed to the proposition witness had previously made.    On this occasion witness states that he again referred to the unsoundness of Marr's Bank.    He proves that he and Miller at that time were worth $20,000 of property, free from incumbrance and subject to execution.    On cross-examination he states that Copeland did not say in the Nashville conversation that he could do better because he could get a higher rate of interest.    He was also examined as to the condition of the Livingston bank, and stated that it had a capital of $20,000; that it owed depositors, at the date Marr's Bank failed, $37,-307.04, and had cash, $4,527, and loan notes, $28,-700; that it had tied up in the Commercial National Bank, which had then failed, $20,080.80; that after the failure of the Commercial National Bank, the Livingston bank borrowed all the money it could get, and paid ten to twelve per cent. for it from some parties, and lower rates to others, the cashier and

21—12 P

State, for use, etc., *v.* Copeland.

president going the bank's security. Miller corrobo-
rates Estes in many particulars. He states, in addi-
tion, that he offered Copeland interest on his deposit,
which Copeland declined, but said he would accept a
gratuity; that they borrowed all the money they could
get to tide their bank over the financial troubles.

Copeland, being recalled, states that in the con-
versation at Nashville no mention whatever was
made of Marr's Bank, and only upon one other oc-
casion, when Mr. Estes, referring to one of Marr's
circulars, said that his bank would break some day.
He corroborates Estes and Miller about the propo-
sition to return the funds to Livingston bank, and
that Miller and Estes would be securities and allow
four per cent. interest, to which he replied, he could
beat that—meaning that he could beat it by keep-
ing the money safe, for he had examined into the
condition of the Livingston bank, after the failure
of the Commercial, and did not consider it safe,
and knew that it was borrowing all the money it
could get. He consulted with attorneys and others,
and was advised not to return his money to the
Livingston bank, and in this he is corroborated by
several witnesses. This is the substance of all the
testimony as to the condition of the bank, and the
caution and care exercised by defendant, Copeland,
in regard to it.

It is said that defendant had no right to deposit
in any bank; that by so doing he simply parted
with the money and made the bank his debtor; that

he could not loan the money directly to a bank or an individual, and that a deposit is virtually a loan; and that it should have been kept as a special deposit in some vault or safe. This argument, we think, is quite plausible, but is more specious than sound. If the money had been deposited in a vault of a bank or in a safe, and lost, under the authorities cited and relied on by plaintiff, the defendant would still have been liable, even though it had been placed in a safe furnished for that purpose by the county or State authorities. *Jefferson County Commissioners* v. *Limbergen*, 35 Am. Rep., 462; 22 L. R. A., p. 451, note.

The question resolves itself into a business proposition, whether it is more prudent to deposit the money in bank or place it as a special deposit in some vault or safe. The concensus of public opinion, and the almost universal trend of business transactions, is in favor of the former proposition, bearing in mind that the funds must be kept separate and apart, and must be put to the proper credit, and be subject to immediate check, and placed in a bank whose reputation is above question, and the deposit made in good faith, and not because of personal benefits or advantages which may accrue to the officer. Our Act making it a felony to receive interest upon money deposited in bank by a public officer, impliedly concedes that it may be deposited in bank. The liability of banks for special deposits is quite limited. If the deposit is for hire, then

ordinary care only is required; if no hire or compensation is paid, only slight care is required, and the bank is only liable for gross negligence. 2 Am. & Eng. Enc. L., 95, 96, and notes. The law allows an officer no compensation to be used in the hiring of a special deposit.

We do not consider a public officer a special bailee in the sense that he must keep the identical funds which he collects, and pay them out. If this be held, it must necessarily result in much embarrassment and confusion. In the first place, it would necessarily follow that the collector must receive only gold, silver, or such money as is a legal tender, for he could only require those who have demands against the fund to receive such legal tender. Again, he must handle this fund every time it becomes necessary to make a payment out of it, and thus expose it upon every occasion when it is necessary to handle it. It would also follow that he must have it in such shape, denominations, and amounts as would enable him to make the exact change necessary to pay each claimant, otherwise he would be compelled to mingle other funds with it, and thus destroy its integrity as the original money received. It would prevent the giving of checks, which are so necessary to the prompt and proper dispatch of business and keeping of accounts in every day transactions.

The learned Chancellor was of opinion that due caution and diligence was not used by defendant.

He says: " In this case, the defendant made no personal examination, nor did he have any examination made, as to the solvency of Marr's Bank, nor had the bank officials made any publication for a long while of its condition, as required by its charter. He took the opinion of his friends, whom he confided in, but the opinions given were not based upon an examination or actual knowledge as to the solvency of the bank."

Nothing can be predicated to the prejudice of the defendant that he did not make, or cause to be made, a personal examination of the bank. Such an examination, except, perhaps, by an expert, would have resulted in nothing reliable. Nor would any bank of standing submit to a personal examination by its customers. The standing of a bank can alone be determined by outsiders by its mode of doing business, and its reputation in business circles. The fact that it did not make the stated publications required by law, is a circumstance to be considered, with all others, bearing upon the question of due caution in its selection, and must be considered in connection with the fact that, although the law stood upon the statute books, it had not been observed by State banks. The want of such publication is a failure to comply with the law, but, under the circumstances, not an indication of unsafe condition.

The conclusions to which we come, upon an examination of the entire record, are—

1. That the defendant was not an insurer of the

safety of the public funds in his hands, but responsible only for the exercise of the good faith, diligence, prudence and caution, and a disinterested effort to keep and preserve the fund for those entitled.

2. That it was neither negligence nor want of proper business prudence and caution to deposit the funds in a bank of undoubted standing and reputation, and Marr's Bank, at the time of the deposit had such standing and reputation.

3. The defendant, Copeland, cannot be considered as a debtor for the funds in his hands, but, on the contrary, had no right to use them in any way except for the purposes of his trust, and he held them, not strictly as a special bailee, but as a trustee, clothed with legal duties and liabilities.

4. The measure of the Trustee's liability is fixed by the laws relating to his office, and not merely by the terms of his bond, and there is no unconditional obligation to pay under any and every contingency. The primary object and purpose of this bond is not to fix or define the limit of his liability, but to superadd to his personal responsibility the security of his bondsmen, and the liability of both principal and sureties under the bond is fixed by the laws relating thereto.

5. The weight of the evidence is that there was no agreement that interest should be paid upon the deposit by Marr, and defendant, Copeland, was not

influenced by this consideration to make the deposit in that bank.

6. The defendant, Copeland, was justified in not returning the funds to the Livingston bank when the president and cashier of that bank suggested that it be done. The proposition made by the president and cashier to induce its return was an illegal one, so far as interest promised was concerned, and was calculated to arouse suspicion as to the condition of the bank. Nor would it have been an act of prudence, under the facts in this record, to return the fund to that bank in its condition at that time, even though it was secured by the personal indorsement of the president and cashier. The liability of the bank, as well as these officers, was at that time too great to warrant the Trustee in putting his funds into their hands, even on the security offered.

7. The decree of the Chancellor in holding the defendant, Copeland, and his sureties liable for the funds deposited in the Nashville Savings Company, and which were lost by its failure, is erroneous under the facts in this record, and must be reversed and the bill must be dismissed.